FILED
CLERK
8/28/2014 3:21 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
JAMAL M. SAFA,

Plaintiffs,

-against-

DEUTSCHE LUFTHANSA AKTIENGESELLSCHAFT, INC., *a foreign corporation*,

Defendant.
---------------------------------------------------------X

**MEMORANDUM OF DECISION AND ORDER**
12-cv-2950 (ADS)(SIL)

**APPEARANCES:**

**Podhurst Orseck, P.A.**
*Attorneys for the Plaintiff*
City National Bank Building
25 West Flagler Street
Suite 800
Miami, FL 33130
By: Ricardo M. Martinez-Cid, Esq., Of Counsel

**Nixon Peabody**
*Attorneys for the Defendant*
50 Jericho Quadrangle
Suite 300
Jericho, NY 11753
By: Joseph J. Ortego, Esq.
Thomas M. Mealiffe, Esq., Of Counsel

**SPATT, District Judge.**

On February 14, 2012, the Plaintiff Jamal M. Safa (the "Plaintiff") commenced this damages action under the Convention for the Unification of Certain Rules Relating to International Carriage by Air, concluded at Montreal, Canada, on May 28, 1999 (the "Montreal Convention"). The action was also brought under all relevant laws applicable or related thereto, including but not limited to the Convention for the Unification of Certain Rules Relating to

International Carriage by Air, signed at Warsaw on October 12, 1929 (the "Warsaw Convention"), 49 U.S.C. § 1502 *et. seq.*, as amended by the Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at The Hague on October 28, 1955.

On June 30, 2014, the Defendant Deutsche Lufthansa Aktiengesellschaft, Inc. ("Lufthansa"), a foreign corporation, moved pursuant to Federal Rule of Civil Procedure 56 ("Fed. R. Civ. P.") 56 for summary judgment dismissing the complaint in its entirety.

For the reasons set forth below, the motion for summary judgment is granted.

## I. BACKGROUND

A. Factual History

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements and exhibits submitted and construed in a light most favorable to the non-moving party, the Plaintiff. Triable issues of fact are noted.

1. Lufthansa Policies and Procedures for Medical Situations

Policies and procedures for how a Lufthansa flight crew should respond to a medical emergency are set forth in a Flight Safety Manual, with which cabin and cockpit crews are contractually obligated to be familiar. The cabin and cockpit crew are also trained on specific areas of the manual, including through web-based training with tests and live training. Some training is provided by Medifan, a company that specializes in medical training.

In November 2011, the time of the underlying events, the policies and procedures in place for Luftansa flight crews in the event of a medical emergency were as follows: (1) the crew member who learns of the situation notifies the rest of the crew, including the purser, who is the leader of the cabin crew; (2) one crew member attends to the passenger; (3) another crew

member retrieves the medical equipment and brings it to the scene; (4) the purser seeks medical expertise on board through the use of the Public Address system, and/or by checking the passenger list for a medical doctor in the event the doctor voluntarily disclosed his presence pursuant to a voluntary Lufthansa program; and (5) the purser then informs the cockpit crew of the incident.

If a doctor has been identified, the next steps are (1) the doctor is provided with the doctor's kit; (2) the crew assists the doctor to the extent they feel competent; (3) the crew asks the doctor(s) opinion with regard to the severity of the incident and his or her recommendation; and (4) the information conveyed by the doctor is relayed to the captain by the purser.

During the course of the medical event, the purser fills out an Emergency Report, which notes the symptoms present, and the treatment provided. In the event that doctors respond, those doctors that provide treatment are noted in the report. The report is not required to be provided to the pilot, as it is within the control of the purser during the flight, who is the intermediary with the doctor.

The Lufthansa Flight Safety Manual states, "[i]f possible, the emergency report should be completed by the doctor treating the patient." Flight Safety Manual, General Part, 5.8.4 [LUF001379]. However, the Flight Safety Manual further instructs that if it is not possible for a doctor to complete the report, the crew is to complete certain sections, including noting the passenger's pulse, blood pressure, general appearance, and whether he or she has chest pain. Id.

In addition, International SOS ("ISOS") provides a service to some Lufthansa aircraft, whereby a dispatch center is available by satellite phone, with medical personnel, such as nurses and paramedics, available, as well as a doctor on-call, who can speak with the crew on board the flight and assist in the gathering of information by the cabin crew so that decisions, including

whether or not to divert the plane, can be made. At the time of the underlying incident, in November 2011, the Lufthansa policies and procedures with regard to medical emergencies and diversions did not require ISOS to be contacted when a doctor was present on board.

In addition, of relevance here, Section 5.8 of the Flight Safety Manual provides flight crews with information relating to the symptoms of "Angina Pectoris/Heart Attack," with measures that could be taken if those symptoms presented themselves. These symptoms include "anxiety and tight feeling in the chest," "restlessness and fear," "shortage of breath," "irregular pulse," and "cold sweat." The Flight Safety Manual instructs that nitroglycerin, otherwise known as nitrolingual, should be administered if a heart attack is suspected. Section 5.8 also states as follows:

> If these measures do[] not indicate considerable recovery, an intermediate landing has to be planned. The situation is life-threatening, the possibility of a heart attack suggest itself.

Beyond the Flight Safety Manual, Lufthansa's training captain testified that Lufthansa pilots are taught that the above-mentioned symptoms "suggest[] a heart attack," that the "suggestion of [a] heart attack is a life-threatening condition," and that a "diversion has to be planned" where there is "a danger for life." (Rolf Uzat Dep., at 32.) This is partly because, on board an aircraft, a number of medical functions – including blood tests or an Electrocardiogram – cannot be administered in response to a passenger having a heart attack. However, Luftansa's medical director, Dr. Jürgen Graf, testified that the flight captain, rather than any doctors on board the aircraft, is ultimately responsible for any decision to divert.

2. The November 12, 2011 Incident

On November 12, 2011, the Plaintiff was scheduled to fly on Lufthansa Flight LH427 from Philadelphia to Beirut, Lebanon, with a layover in Frankfurt. The Plaintiff boarded the flight in Philadelphia and had Seat 35D, an aisle seat. Katja Poggenpohl ("Poggenpohl") was the purser in charge of the Lufthana Flight LH427.

Approximately three hours before landing in Frankfurt, Poggenpohl was alerted by a passenger of a potential problem with another passenger. Poggenpohl immediately approached the economy class cabin and found the Plaintiff lying in the aisle. The Plaintiff testified that, after he fell to the ground, he was almost unconscious, but remembers complaining of chest pain as he was moved to the galley or the rear of the aircraft.

Pursuant to Lufthansa procedure, Poggenpohl moved the Plaintiff to a safe location in the rear of the aircraft. Also, in accordance with Lufthansa procedure and training, the flight attendants gathered the on board emergency equipment and Poggenpohl made an announcement requesting medical assistance from any doctors on board. Two or three licensed physicians volunteered and cared for the Plaintiff – in particular, they took the Plaintiff's pulse and blood pressure; initiated an IV line to give the plaintiff an infusion of fluids; administered nitroglycerin, tramal, and metamizol; and attached a defibrillator to the Plaintiff.

One of the physicians was a specialist in intensive care and emergency medicine. However, none of the physicians were board-certified in cardiology.

The Plaintiff complained of pressure in his upper body and appeared sweaty, hyper, and afraid. Dr. Graf, who was not on board the flight, testified that the Plaintiff's complaints of chest pain, paleness, and cold sweats could have been indicative of a variety of conditions, including high blood pressure, a vasovagal episode, or anxiety.

The physicians reported, and Poggenpohl recorded on the emergency report, that the Plaintiff's pulse was 87, which the physicians told Poggenpohl was normal. However, in its Flight Safety Manual, Lufthansa instructs its employees that a normal pulse is between 60 and 80 beats per minute. The physicians also told Poggenpohl that the Plaintiff's blood pressure and heart rhythm were normal.

The Cosmic Report or CMR detail completed after the incident by Poggenpohl indicates that the on board physicians considered whether the Plaintiff was having a heart attack. Cosmic Report, Ex. 2 to Poggenpohl Dep. ("medical staff was not sure if he had a cardial infarction").

While the physicians attended to the Plaintiff, Poggenpohl phoned the cockpit to alert the Captain, Gerhard Fischer, that there was a medical situation on board and that a passenger, the Plaintiff, was experiencing chest pressure, was pale, sweating, and was frightened. Fischer was provided with the Emergency Report, which reflected that the Plaintiff had chest pain and circulatory collapse, an elevated pulse, and was hyperventilating. Fischer was also told that the Plaintiff's symptoms included an "excited pulse, so a little bit more than [a] normal pulse." (Fischer Dep. at 13.) Poggenpohl mistakenly told Fischer that a "cardiologist" was taking care of the Plaintiff. (Poggenphol Dep. at 23.)

However, Fischer testified that he was not aware that the Plaintiff was experiencing chest pain, shortness of breath, cold sweats, or that he was hyperventilating. (Fischer Dep. at 45-46.) He testified that if he had known of these symptoms, he would have been more "intriguing[,] more thorough," and would have "maybe even asked [the] doctors[to] get on the telephone, talk to [him] personally" in order to confirm that they were certain the Plaintiff was not suffering from a "grave condition." (Fischer Dep. at 46.)

At the time Fischer was informed of the medical issue on board, the aircraft was approximately one hour flight time from Ireland, and about three to three and a half hours from Frankfurt. (Fischer Dep. at 6-7.) Fischer considered alternatives in the event the medical situation worsened, and examined potential re-routing to Dublin or London. Fischer related to the Frankfurt airport that a passenger likely experienced a heart attack.

At some point, Fischer attempted to call the ISOS medical hotline via satellite phone to obtain the opinion of an independent doctor. However, the satellite phone was not operational.

About five minutes after his initial communication with Poggenpohl, Fischer was updated by Poggenphol that "right now nothing serious seems to be the matter" and that the Plaintiff was being kept "stable." (Fischer Dep. at 12.) Fischer later asked Poggenpohl to ask the physicians if they foresaw the necessity to land in Dublin, and "the answer to that was a very clear no." (Fischer Dep. at 13.)

Relying on this information, Fischer ultimately chose not to divert the aircraft for an intermediate landing. Rather, it was arranged for both an ambulance and an emergency doctor to be present at the gate in Frankurt upon the landing of the aircraft. When the aircraft landed, the Plaintiff was placed in an ambulance to be transported to the hospital. While in the ambulance, the Plaintiff suffered a prolonged cardiac arrest, requiring six shocks. Upon admission to the hospital, the Plaintiff underwent surgery to have a stent replaced, and was placed on a ventilator and under hypothermic protocol for a prolonged period of time.

B. Procedural History

On February 14, 2012, the Plaintiff commenced this action in the United States District Court for the Southern District of Florida. By order dated June 12, 2012, the case was

transferred to the United States District Court, Eastern District of New York and later assigned to this Court. The Plaintiff seeks damages under Article 17 of the Montreal Convention.

On June 30, 2014, after the close of discovery, the Defendant moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint in its entirety. In support of that motion, the Defendant contends that (1) the Plaintiff's medical episode on board Lufthansa Flight LH427 did not constitute an actionable "accident" under the Montreal Convention and alternatively (2) the Defendant did not act negligently and therefore any recovery by the Plaintiff must be limited to "Special Drawing Rights" as set forth in Article 21(2)(a) of the Montreal Convention.

In opposition, the Plaintiff contends that he is not asserting that the underlying medical episode itself constituted an "accident" under the Montreal Convention or claiming that that the Defendant's training policies and/or procedures were inadequate or improper. Rather, the Plaintiff argues that the Defendant's failure to comply with its own policies and/or procedures aggravated the Plaintiff's injuries.

## II. DISCUSSION

A. The Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, --- U.S. ----, ----, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment." Id. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship., 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

B. The Applicable Law Under the Montreal Convention

The Montreal Convention updated and replaced the uniform system of liability for international air carriers previously established by the Warsaw Convention. Ehrlich v. Am. Airlines. Inc., 360 F.3d 366, 371 n. 4 (2d Cir. 2004). Whereas the Warsaw Convention sought to encourage the development of commercial aviation by limiting liability, the Montreal Convention reflects an additional consideration: "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Id. (quoting Montreal Convention, pmbl.).

Many terms of the Montreal Convention and the Warsaw Convention are substantively similar, and the Court may rely on precedent interpreting the Warsaw Convention's parallel provisions when addressing claims under the Montreal Convention. See Baah v. Virgin Atlantic Airways Ltd., 473 F. Supp. 2d 591, 596-97 (S.D.N.Y. 2007); see also Best v. BWIA W. Indies

Airways Ltd., 581 F. Supp. 2d 359, 362 (E.D.N.Y. 2008)("Because many of the provisions of the Montreal Convention are taken directly from the Warsaw Convention and the many amendments thereto, the case law regarding a particular provision of the Warsaw treaty applies with equal force regarding its counterpart in the Montreal treaty.").

In language nearly identical to Article 17 of the Warsaw Convention, the Montreal Convention provides that an air carrier may be liable on claims for bodily injury to a passenger of an international flight if "the accident which caused the . . . injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention art. 17. The Supreme Court has defined "accident" under the Convention as "an unexpected or unusual event or happening that is external to the passenger." Air Fr. v. Saks, 470 U.S. 392, 405, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (1985). The definition "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." Id.

Complications arising from a passenger's medical conditions are not external to the passenger, and thus are not "accidents" under the Montreal Convention. See Rajcooar v. Air India, Ltd., 89 F. Supp. 2d 324, 328 (E.D.N.Y. 2000)(a heart attack was not external to passenger, and thus was not an "accident" under the Warsaw Convention). There is also a line of cases that hold that an airline's failure to respond with adequate medical assistance to an injury suffered aboard an aircraft does not constitute an "accident" under the Montreal Convention. See e.g., Rajcooar v. Air India Ltd., 89 F. Supp. 2d 324, 328 (E.D.N.Y. 2000)(finding inadequate medical care does not constitute an "accident" without some showing of unexpected circumstances); Tandon v. United Air Lines, 926 F. Supp. 366, 369–70 (S.D.N.Y. 1996)(finding that airline crew's failure to respond with adequate medical assistance to passenger suffering a heart attack did not constitute an "accident"); Walker v. Eastern Air Lines, Inc., 775 F. Supp.

111, 114 (S.D.N.Y. 1991)(stating that parties agreed that no "accident" occurred when airline crew aggravated pre-existing condition of passenger); Krys v. Lufthansa German Airlines, 119 F.3d 1515, 1520 (11th Cir. 1997)("[I]n the absence of proof of abnormal external factors, aggravation of a pre-existing injury during the course of a routine and normal flight should not be considered an 'accident' within the meaning of Article 17."); Abramson v. Japan Airlines Co., 739 F.2d 130, 132 (3d Cir. 1984)(finding that flight attendant's worsening of hernia condition was not an unusual or unexpected occurrence).

On the other hand, a flight crew's unexpected and unusual response to a passenger's medical condition is external to the passenger, and can be a Montreal Convention "accident." Olympic Airways v. Husain, 540 U.S. 644, 646, 124 S. Ct. 1221, 157 L. Ed. 2d 1146 (2004)(finding that airline's failure to move an asthmatic passenger away from smoke during flight resulting in passenger's death was an accident under the Montreal Convention). This point was made clear by the following analysis by the Supreme Court in Olympic Airways:

> Suppose that a passenger on a flight inexplicably collapses and stops breathing and that a medical doctor informs the flight crew that the passenger's life could be saved only if the plane lands within one hour. Suppose further that it is industry standards and airline policy to divert a flight to the nearest airport when a passenger otherwise faces imminent death. If the plane is within 30 minutes of a suitable airport but the crew chooses to continue its cross-county flight, "the notion that this is not an unusual event is staggering."

Id. at 656 (quoting McCaskey v. Continental Airlines, Inc., 159 F. Supp. 2d 562, 574 (S.D. Tex. 2001))

Consistent with Olympic Airways, courts have recognized that a Montreal Convention plaintiff may establish an "accident" based on proof of a flight crew's unexpected or unusual response to a passenger's medical emergency, particularly a diversion from expected policies

and procedures. Fulop v. Malev Hungarian Airlines, 175 F. Supp. 2d 651, 664 (S.D.N.Y. 2001)("Fulop I").

In Fulop I, a passenger suffered a heart attack shortly after his flight departed from Budapest. Id. at 652. Contrary to established airline procedure, the crew decided not to divert the flight after consulting a doctor on board. Id. at 652, 664. The court denied the airline's motion for summary judgment with respect to the plaintiff's Article 17 claim, allowing for the possibility that an airline's failure to abide by its own procedures respecting flight diversion in response to a medical emergency could constitute an "accident" under certain circumstances.

The court reasoned that "the ordinary traveler reasonably would expect that . . . in handling life-threatening exigencies, airlines . . . would be particularly scrupulous and exacting in complying with their own industry norms, internal policies and procedures, and general standards of care." Id. at 665. Accordingly, the court concluded, an airline's "alleged deviation from its own rules and standards that were in place to deal with passengers stricken by medical emergencies may be sufficient to support a determination that such an event . . . was unusual or unexpected, and thus an accident. . . ." Id.

The defendant air carrier whose motion to dismiss was denied in Fulop I ultimately prevailed after a bench trial in Fulop II. Based upon the evidence presented at the trial, the Fulop II Court held that the pilot did not deviate from policy and procedure when he chose not to divert an international flight after the plaintiff's heart attack. Fulop II, 244 F. Supp. 2d at 220.

Here, even assuming it was clear at the time that the Plaintiff suffered a heart attack while on board Flight LH427, the Court finds that the Plaintiff has not pointed to any "significant departure" from a Lufthansa policy and procedure that was unexpected and could be deemed an "accident" under the Montreal Convention. Fulop I, 175 F. Supp. 2d at 665. Rather, the record

makes clear that the crew of Flight LH427 followed Luftansa policy and procedure in all material respects.

In particular, Poggenphol, the purser on the flight, was informed of and responded to the medical situation, at which time the Plaintiff was taken to the galley. Medical equipment was gathered and Poggenpohl requested medical assistance, the result of which two or three physicians responded. With the physicians administering care to the Plaintiff, Poggenpohl informed the cockpit crew of the situation. Poggenpohl completed an emergency medical report and obtained the opinions of the physicians regarding the severity of the incident. The physicians expressed their opinion that they were uncertain if the Plaintiff had suffered a heart attack but essentially advised that no life threatening situation presented itself. Poggenpohl conveyed this opinion to the cockpit crew, including Fischer.

The Plaintiff points to the testimony of Uzat and Fischer that a heart attack is a life-threatening event. However, even if it was clear at the time at that the Plaintiff suffered a heart attack while on board Flight LH427, it does not follow that that an intermediate landing was required. Rather, the ultimate decision to divert or not rested with Fischer. In this regard, the Plaintiff concedes that "[a] diversion is not required even in a life-threatening medical emergency situation, because the entire situation needs to be assessed, and the safety of the other passengers and crew needs to also be considered." (Consol. Rule 56.1 Statement, at ¶ 66.) Indeed, Section 5.8 of the Flight Safety manual, which provides flight crews with information relating to the symptoms for "Angina Pectoris/Heart Attack," with certain measures to be taken if those symptoms present themselves, states that, if those measures do not alleviate the situation, an intermediate landing must be "planned," not necessarily consummated. Thus, to the extent the Plaintiff argues that his condition constituted a life threatening situation and that all life

threatening situations demand diversion, the Plaintiff seeks to engraft an addendum onto Luftansa policies and procedures.

The Plaintiff also points to Fischer's testimony that if he "know[s] that [a]passenger is in a life-threatening situation," he will "absolutely" divert the flight. (Fischer Dep. at 21.) However, Fischer's testimony is consistent with Lufthansa policy and procedure, which provides, as noted above, that an intermediate landing only needs to be "planned" if the measures used to address the symptomology do not indicate considerable recovery.

The Plaintiff also faults Poggenpohl for inaccurately reporting events to Fischer by, for example, mistakenly identifying one of the on board physicians as a cardiologist. According to the Plaintiff, this undisputed fact, coupled with Graf's deposition testimony that the purser must transfer all information to the pilot, suffices to qualify the medical episode as an "accident" required to state a claim under the Montreal Convention. However, properly framed, this specific complaint speaks to whether the response of the Flight LH427 crew was adequate in a medical sense – a complaint which could not form the basis of a claim under the Montreal Convention – rather than whether the crew complied with Luftansa policy and procedure.

Finally, the Court finds that the failure to establish a satellite connection with the ISOS hotline did not constitute a "significant departure" from Luftansa policy and procedure. The Plaintiff concedes that, at the time of the underlying events, contacting the hotline was not a Lufthansa requirement. (Consol. Rule 56.1 Statement, at ¶ 28.)

The case of Sook Jung Lee v. Korean Air Lines Co., Ltd., No. 10–01709 (JVS), 2012 WL 1076269, at *5–*7 (C.D. Cal. 2012) is instructive. There, the court granted an airline's motion for summary judgment where the evidence established that the flight crew followed all of its procedures following discovery of a passenger's stroke, including diversion and landing of the

flight at the advice of a passenger with medical expertise. Similarly, here, the Court finds that no material issue of disputed fact exists as to whether the Flight LH427 crew significantly departed from Luftansa policy and procedure. Rather, the undisputed facts indicate that the Flight LH427 crew complied with the relevant policy and procedure.

In sum, the Court finds that the Plaintiff cannot establish that the Plaintiff's injuries were the result of an "accident" as that term is understood under the Montreal Convention. Summary judgment is therefore appropriate. In light of the Court's findings, it need not address whether the crew's response "caused" the Plaintiff's injuries and whether any recovery by the Plaintiff must be limited to Special Drawing Rights.

## III. CONCLUSION

For the foregoing reasons, the Court grants the Defendant's motion pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint. The Clerk of the Court is directed to close the case.

**SO ORDERED.**

Dated: Central Islip, New York
August 28, 2014

____*Arthur D. Spatt*__________________
ARTHUR D. SPATT
United States District Judge